MC21-116

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:21-cv-694-CEM-DCI

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

Vs.

HARBOR CITY CAPITAL CORP.,
HARBOR CITY VENTURES, LLC,
HCCF-1 LLC,
HCCF-2 LLC,
HCCF-3 LLC,
HCCF-4 LLC,
HCCF-5 LLC,
HARBOR CITY DIGITAL VENTURES, INC.,
HCC MEDIA FUNDING, LLC,
JONATHAN P. MARONEY,

               Defendants,

And

CELTIC ENTERPRISES, LLC,
TONYA L. MARONEY,

               Relief Defendants.

2021 APR 20 AM 11:53
US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

FILED

**UNDER SEAL**

FILED
LODGED
RECEIVED

**MAIL**

NOV 15 2021

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

---

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

    Plaintiff Securities and Exchange Commission ("Commission") alleges:

## I.    INTRODUCTION

    1.    This an emergency action to stop an ongoing, fraudulent Ponzi-scheme victimizing hundreds of investors across the United States. From at

5~

least May 2015 and continuing through the present, Harbor City Capital Corp. ("Harbor City") and its founder and Chief Executive Officer, Jonathan P. Maroney, have raised more than $17.1 million through a series of unregistered fraudulent securities offerings in several entities formed and controlled by Harbor City and Maroney.

2.      The offerings were in a company called Harbor City Ventures, LLC ("HC Ventures"), and five "special purpose" entities, HCCF-1 LLC, HCCF-2 LLC, HCCF-3 LLC, HCCF-4 LLC and HCCF-5 LLC (collectively referred to as the "HC SPEs"). Harbor City served as the Manager of the HCCF-1 through HCCF-4 offerings, and another Maroney created and controlled company, Harbor City Digital Ventures, Inc. ("HC Digital"), served as their "Operator." HCC Media Funding, LLC ("HCC Media"), controlled by Maroney, serves as both the Manager and Operator of the ongoing HCCF-5 offering.

3.      The securities sold were in form of either promissory notes, funding agreements, or "high yield, secured bonds" (in the case of the HC SPEs), promising returns ranging from 1% to 5% per month. The purported purpose of the offerings was to provide bridge funding for Harbor City's and its related companies' customer lead generation sales businesses. Investors were solicited primarily through Harbor City's website and a series of on-line marketing videos featuring Maroney posted on YouTube.

4.     Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney, orally and in offering materials, made material misrepresentations and omissions to investors and engaged in a scheme to defraud and a course of conduct designed to deceive investors.  Specifically, despite statements made by Harbor City, HC Ventures, the HC SPEs, HC Digital, and HCC Media in the offering materials that investor funds would be used to finance Harbor City's customer lead generation campaigns, Defendants misappropriated approximately $4.48 million in investor funds, which was diverted for Defendant Maroney's personal use.

5.     Of the millions in investor funds that Defendant Maroney diverted for his personal use, Relief Defendants Celtic Enterprises ("Celtic") and Tonya Maroney, received more than $1 million in ill-gotten gains for no legitimate reason.

6.     Defendants also misused approximately $1.4 million of investor money by making payments to other entities unrelated to the supposed purpose of the offerings.  Moreover, at least $6.5 million of the returns distributed to investors were in reality Ponzi-like payments funded by other investors.

7.     In addition, Defendants made other false claims and omissions to investors regarding, among other things, Harbor City's purported UCC lien

3

filings and its "Standby Line of Credit," and Maroney's prior disciplinary history with Alabama securities regulators.

8.     Through their conduct, Defendants have violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act").   Unless restrained and enjoined, Defendants are reasonably likely to engage in future violations of the federal securities laws.

## II.     DEFENDANTS AND RELIEF DEFENDANTS

### A.     Defendants

9.     **Harbor City** is a Nevada corporation formed in December 2014 with its principal place of business in Melbourne, Florida.   Harbor City and its securities have never been registered with the Commission in any capacity. Harbor City filed a Form D Notice of Exempt Offering of Securities with the Commission on January 29, 2019, seeking to raise $1,000,000 in debt securities with a $50,000 minimum investment amount purportedly under a Rule 506(c) exemption.

10.     **HC Ventures** is a Nevada limited liability company established in 2014 with its principal place of business in Melbourne, Florida.  HC Ventures and its securities have never been registered with the Commission in any capacity.

4

11.     HCCF-1 is a Nevada limited liability company formed in August 2018 with its principal place of business in Melbourne, Florida. HCCF-1 is wholly-owned and managed by Harbor City. HCCF-1 and its securities have never been registered with the Commission in any capacity.

12.     HCCF-2 is a Nevada limited liability company formed in April 2019 with its principal place of business in Melbourne, Florida. HCCF-2 is wholly-owned and managed by Harbor City. HCCF-2 and its securities have never been registered with the Commission in any capacity.

13.     HCCF-3 is a Wyoming limited liability company formed in September 2019 with its principal place of business in Melbourne, Florida. HCCF-3 is wholly-owned and managed by Harbor City. HCCF-3 and its securities have never been registered with the Commission in any capacity.

14.     HCCF-4 is a Wyoming limited liability company formed in November 2019 with principal place of business in Melbourne, Florida. HCCF-4 is wholly-owned and managed by Harbor City. HCCF-4 and its securities have never been registered with the Commission in any capacity.

15.     HCCF-5 is a Wyoming limited liability company formed in July 2020 with its principal place of business in Melbourne, Florida. HCCF-5 is wholly-owned and managed by Harbor City. HCCF-5 and its securities have never been registered with the Commission in any capacity.

16. **HC Digital** is a Nevada corporation established in 2017 with its principal place of business in Melbourne, Florida. HC Digital is the "Operator" of the HCCF-1, HCCF-2, HCCF-3 and HCCF-4 offerings.

17. **HCC Media** is a Wyoming limited liability company established in 2020 with its principal place of business in Melbourne, Florida. HCC Media is both the Manager and "Operator" of the HCCF-5 offering.

18. **Maroney**, 50, resides in Melbourne, Florida. Maroney is the founder, Chief Executive Officer, and President of Harbor City, and the President of HC Digital. He is also the sole Manager of HC Ventures, HCC Media, and each of the HC SPEs. In June 2020, the Alabama Securities Commission issued a cease and desist order prohibiting Maroney, Harbor City and HC Digital from offering or selling securities in the state.

## B. Relief Defendants

19. **Celtic** is a Wyoming limited liability company with its principal place of business listed in Melbourne, Florida. Maroney is the Manager of Celtic. Without any legitimate basis, Celtic received at least $617,000 in ill-gotten gains emanating from the Defendants' securities fraud.

20. **Tonya L. Maroney**, 51, resides in Melbourne, Florida and is married to Jonathan P. Maroney. Without any legitimate basis, Tonya Maroney

received at least $452,000 in ill-gotten gains emanating from the Defendants'

securities fraud.

III.   **JURISDICTION AND VENUE**

21.     The Court has jurisdiction over this action pursuant to Sections

20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a);

and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e),

and 78aa.

22.     The Court has personal jurisdiction over the Defendants and Relief

Defendants, and venue is proper in the Middle District of Florida, because many

of the Defendants' acts and transactions constituting violations of the Securities

Act and the Exchange Act occurred in the Middle District of Florida.   In

addition, the principal place of business of all the entity Defendants and Relief

Defendant Celtic was in the Middle District of Florida, and during the relevant

time period, Jonathan and Tonya Maroney resided in the Middle District of

Florida.

23.     In connection with the conduct alleged in this Complaint, the

Defendants, directly and indirectly, singly or in concert with others, have made

use of the means or instrumentalities of interstate commerce, the means or

instruments of transportation and communication in interstate commerce, and

the mails.

## IV.   THE DEFENDANTS' FRAUD

### A.   Defendants' Unregistered Securities Offerings

24.     From at least 2015, continuing through the present, Harbor City,
HC Ventures, the HC SPEs, HC Digital, and HCC Media, through Maroney,
have raised more than $17.1 million from more than 100 investors nationwide
through a series of unregistered fraudulent securities offerings.   Initially,
starting in about May 2015, the securities sold were in form of either promissory
notes or agreements entitled "Unsecured Promissory Notes" and "Fixed-Rate
Funding Agreements" issued by HC Ventures, an affiliated entity Maroney
controlled.

25.     These earlier notes and agreements offered investors interest rates
varying from 2% to 5% per month for terms ranging from 12 to 36 months.
Investors in those instruments were promised a full return of their investment
principal upon maturity.

26.     Beginning in late 2018, the securities sold took the form of "high
yield, secured bonds" issued by the five "special purpose" entities formed and
controlled by Maroney—first, through HCCF-1, followed by HCCF-2, HCCF-3,
HCCF-4, and most recently HCCF-5.   The so-called high yield, secured bonds
issued in the HC SPEs offerings promised interest rates that varied from 1% to
1.5% per month.   The bonds are offered in 1, 2, 3 or 5 year terms, with a

guaranteed return of investment principal at maturity.  Harbor City serves as

the Manager of the HCCF-1 through HCCF-4 offerings, and another Maroney

controlled company, HC Digital, serves as their "Operator."  HCC Media, also

controlled by Maroney, serves as both the Manager and Operator of the HCCF-

5 offering.

27.    The following chart lists the date, term and rate of return for each

of the Harbor City offerings and the securities issued:

| Issuer | Offering Start Date | Bond Terms | Monthly Returns | Annual Returns |
|---|---|---|---|---|
| HC Ventures | May 1, 2015 | 1 Year<br>2 Year<br>3 Year | 2% to 5% | 24% to 60% |
| HCCF-1 | December 18, 2018 | 2 Year | 1.5% | 18% |
| HCCF-2 | January 28, 2019 | 1 Year | 1.5% | 18% |
| HCCF-3 | July 1, 2019 | 1 Year | 1.5% | 18% |
| HCCF-4 | November 24, 2019 | 1 Year | 1% | 12% |
| HCCF-5 | July 24, 2020 | 1 Year<br>3 Year<br>5 Year | 0.8333%<br>1.0%<br>1.167% | 10%<br>12%<br>14% |

28.    Harbor City, the other Harbor City related companies, and

Maroney represented to investors that proceeds from the offerings will be used

to provide "bridge funding" for Harbor City's business of generating online

customer lead campaigns for other businesses.  A customer lead generation

campaign is essentially the process of capturing online interest in a service or

product for the purpose of developing sales leads.  Harbor City claims that

companies contract with it in advance for an agreed upon quantity of new customer leads for their business, on a cost-per-lead basis. HC Ventures was the entity responsible for conducting the lead generation campaigns for the earlier offering involving the promissory notes and funding agreements. As for the HC SPEs bond offerings, the proceeds were to be "loaned" to either HC Digital or HCC Media, which were the entities charged with managing the SPEs and administering the internet lead generation campaigns.

29.    According to the offering documents, the leads generated from the campaigns were to be sold at a substantial profit to Harbor City's "pipeline" of business clients within the "$200 Billion internet advertising sector." From the resulting profits, investors were supposed to receive monthly interest payments followed by the return of their principal when their notes or bonds mature. With each new offering, Harbor City touted its plan to "expand into as many as 100 online vertical industries." For example, according to HCCF-5's offering documents, the proceeds from that offering were to be used to "fund the ramp-up in lead production needed to service the current pipeline" of business clients.

30.    Defendants solicited and raised money from investors primarily through Harbor City's website and a series of on-line marketing videos featuring Maroney posted both on the company's website and on YouTube. In the on-line videos, Defendant Maroney gives prospective investors a detailed

description of the investment opportunity.  For example, he reiterates in these videos that investor money will be used to fund Harbor City's lead generation business and he tells prospects about the guaranteed returns they could expect to receive.

31.     In a video posted on Harbor City's website, Defendant Maroney describes the Harbor City bond offering as "safe as a CD" and equates it to "going down to your local bank and purchasing a certificate of deposit."  In one of the YouTube videos, labeled "Harbor City Capital Corp. - Safe Investments," he shares that "one of the biggest questions" Harbor City receives from prospective investors is "how do I know my money is safe?"  In the video, Defendant Maroney explains that the Harbor City "bonds are 100% secured by a cash asset-backed instrument issued by a major top-tiered bank, which ensures return of principal."  These representations were false.

32.     Besides the company's website and marketing videos, Defendants also marketed their high yield bonds through pop-up advertisements on social media platforms like Facebook.   One investor recalls a Harbor City advertisement popping up on his Facebook feed advertising guaranteed annual returns of up to 18%.  That investor had not heard of Maroney or Harbor City before then.  Maroney also solicited some investors directly.  He explained to at least one prospective investor that Harbor City bought the leads for $1.00 each

11

and resold them to businesses for $5.00 apiece.  He told the same investor that

Harbor City could "guarantee double digit returns" on his investment using

that strategy.

33.     The offering materials Defendants distributed to investors

included either a "confidential information memoranda" or "private placement

memoranda," a business plan, a subscription agreement, and an "accredited

investor verification" letter.  The offering memoranda and other marketing

materials used in all of the various offerings were substantially similar.

34.     Defendant Maroney maintained bank accounts for Defendant

Harbor City.  He also had separate bank accounts for Defendants HC Ventures,

HC Digital, HCCF-1, HCCF-2, HCCF-3 and HCCF-4.  However, the investor

funds initially deposited into those accounts were later transferred into Harbor

City's accounts and commingled along with funds from the other offerings.

Maroney was the sole signatory on all of the Harbor City and other Harbor City

related companies bank accounts.

35.     After sending in their investments, Defendant Maroney would

often send email updates to investors about Harbor City and the Harbor City

related companies.  In one email Maroney sent to investors in January 2018,

Maroney falsely claimed that there was such "a MASSIVE pipeline of standing

orders for leads" from companies seeking Harbor City's services and expertise

that Harbor City does not "expect to have enough capital to serve ALL of that demand."

36.    The promissory notes, funding agreements, and bonds offered and sold by the proposed defendants are securities. First, the Defendants sold these investments to raise money to be pooled and used to fund their customer lead generation business. In turn, investors purchased the notes, agreements, and bonds from Defendant Harbor City and its related companies in order to earn a profit in the form of significant interest payments. Second, these investments, they were offered or sold to a broad segment of the public. Specifically, the Defendants sold their investments to more than 100 investors residing in numerous states, and offered them to many more investors. Third, Harbor City's investors invested in the offerings– which the company marketed as "investments" – with expectations of receiving interest payments generated from the company using their money to fund its business activities. Investors had no responsibility in the business of generating customer leads, and were entirely passive. Instead, they relied solely on Harbor City and the other Harbor City related companies, and their management, to generate profits.

37.    The promissory notes, funding agreements, and bonds issued in this matter also constitute investment contracts and are therefore securities.

**B.     Defendants' Misuse and Misappropriation of Investor Funds**

38.     Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney represented to investors and prospective investors orally and in offering documents that the proceeds raised from the offerings would be used to fund Harbor City's and the other Harbor City related companies' customer lead generation campaigns.  In return, investors were told that they would receive monthly interest payments from the profits on the leads generated, as well as a return of their principal when their notes, agreements, or bonds matured.   The offering documents distributed to investors also provided that "management will not have any discretion as to any other use of the proceeds" nor "receive any salary."

39.     Contrary to the representations made to investors, Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney were not engaged in a significant lead generation business and only used a small portion of money raised from investors to fund their business.  Instead, from January 2017 to February 2021, Harbor City generated **no** significant revenues from its customer lead generation businesses or from any other venture.  Significantly, of the $17.1 million in investor funds deposited into the Harbor City related bank accounts, at most only about $449,000 *may* have gone to business expenses.

40.   Instead, Maroney used investor money to enrich himself and his family, and to perpetuate the Ponzi scheme by making payments of fictitious returns to existing investors using other investor funds. Specifically, of the $17.1 million raised from Harbor City's investors, Maroney misappropriated more than $4.88 million for his own personal use. Some of the things he spent investor money on include:

- $1.35 million to pay his credit card bills,

- $827,000 towards the purchase and maintenance of his waterfront home,

- $808,000 towards housing and renovation-related expenses,

- $90,000 to purchase a Mercedes Benz,

- $265,000 in cash or ATM withdrawals,

- $394,000 deposited into a joint bank account with his wife, Tonya Maroney, plus $58,000 towards her credit cards, and

- $617,000 transferred to Relief Defendant Celtic, a nominee entity he controls.

41.   In addition, Maroney misused approximately $1.4 million of investor money by making payments to other entities unrelated to the supposed purpose of the offerings, including money sent to a company involved in the container, storage and shipping industry. Thus, about $6 million of investors'

15

money was misappropriated and misused by Defendant Maroney.

42.     Moreover, Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, and HCC Media, through Defendant Maroney, were operating a Ponzi scheme.  Since Defendants promised investors high rates of return but generated no significant revenues from its touted business model, Maroney needed new investor money to make interest payments to existing investors. Since 2017, Maroney used at least $6.5 million of investor funds to make monthly interest payments and other payouts to investors in a classic Ponzi scheme fashion.  As noted previously, Maroney was the sole signatory on all of the entity Defendants' bank accounts.

## C.     Defendants' Material Omissions and Misrepresentations to Investors

43.     In addition, to the misrepresentations detailed above, Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney also told investors that the funding for their customer lead generation business is "provided as a line of credit that is guaranteed by a UCC-1 filed lien" using Defendants Harbor City's, HC Digital's and HCC Media's accounts receivable and purchase orders as collateral.  They claimed that with this "secure position with guaranteed repayment," they are able to mitigate the risk of loss to its investors.

44.     Investors in the HCCF-4 and HCCF-5 offerings were also provided
with an additional purported "bank guarantee" in the form of a "Standby Line
of Credit (SBLC)" issued to Harbor City from what is described as a "top tier
bank." As Maroney explained to one investor, "this cash line of credit is there,
its liquid, it's available, so that if something happens and we can't make our
bond payments or we go bankrupt, … we have a claim on the monies that we've
put on deposit with Harbor City via this cash line of credit."

45.     In truth, the UCC filings and the SBLC do not exist. Defendants
never made any UCC lien filings for any loan-related business transactions.
Moreover, at no point were Defendants ever issued a SBLC. Rather, Defendant
Harbor City, through Defendant Maroney, merely entered into an "Agreement
for Service" dated November 2019 with an intermediary who would have been
responsible for arranging the issuance of a SBLC of $5 million in favor of Harbor
City. The transaction never went through and the Agreement for Service was
canceled less than a month later due to Harbor City's and Maroney's failure to
pay the required fees to secure the SBLC. Despite knowing this SBLC was never
obtained, Maroney continued to falsely tout its existence in publicly available
videos and directly to investors.

46.     The offering documents for the HCCF-5 offering also include a
section discussing HCC Media's "Track Record" that touted Harbor City's "four

successful bond issues." This section of the materials represented that "[a]ll previous bond issues have generated above average returns for the investors, and all investor payments have been completed successfully and on time." Defendant Maroney likewise told at least one investor that everyone has been paid back from the previous offerings. These statements are all false and misleading. In fact, several investors' "interest payments" were often delayed and eventually stopped completely. They contacted Defendant Maroney numerous times demanding their interest payments and a return of their principal investment amounts, but to date have not received their money back. More importantly, the offering materials omitted to disclose to investors that because the Defendants did not generate any significant revenues or profits from their businesses, the "interest payments" and other returns Defendants were paying to investors came from other investor money.

47.   Finally, in Defendant HCCF-5's offering documents, which are dated July 2020, Defendant Maroney touts himself as a "seasoned business growth strategist" with more than 30 years of experience "starting, building, buying, and selling companies in a wide variety of industries." However, the same materials failed to disclose to investors and prospective investors that in June 2020, securities regulators in Alabama issued an administrative cease-and-desist order against Defendants Maroney, Harbor City, and HC Digital for

18

offering and selling unregistered securities and making misstatements and omissions to residents in the state. This omission rendered false and misleading the statements made to investors about Defendant Maroney's background and experience.

### D. Relief Defendants Received Ill-Gotten Gains

48.     Relief Defendants Celtic and Tonya Maroney received investor funds from Harbor City without any legitimate purpose and should be required to disgorge these funds.

## V.     CLAIMS FOR RELIEF

### COUNT I

### Unregistered Sales of Securities in Violation of Sections 5(a) and 5(c) of the Securities Act

49.     The Commission repeats and realleges paragraphs 1 through 48 of its Complaint.

50.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

51.     Starting no later than May 2015 and continuing through the present, Defendants, directly and indirectly, (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to

19

sell securities as described herein, through the use or medium of a prospectus

or otherwise; (b) carried or caused such securities, as described herein, to be

carried through the mails or in interstate commerce, by any means or

instruments of transportation, for the purpose of sale or delivery after sale; or

(c) made use of any means or instruments of transportation or communication

in interstate commerce or of the mails to offer to sell or offer to buy through the

use or medium of any prospectus or otherwise, as described herein, without a

registration statement having been filed or being in effect with the Commission

as to such securities.

52.     By reason of the foregoing, Defendants have violated and, unless

enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the

Securities Act, 15 U.S.C. §§ 77e(a) and (c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act

53.     The Commission repeats and realleges paragraphs 1 through 48 of

this Complaint.

54.     Starting no later than May 2015 and continuing through the

present, Defendants, in the offer or sale of securities by use of any means or

instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

55.   By reason of the foregoing, Defendants have violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud in Violation of Section 17(a)(2) of the Securities Act

56.   The Commission repeats and realleges paragraphs 1 through 48 of this Complaint.

57.   Starting no later than May 2015 and continuing through the present, Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

58.   By reason of the foregoing, Defendants have violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT IV

## Fraud in Violation of Section 17(a)(3) of the Securities Act

59.     The Commission repeats and realleges paragraphs 1 through 48 of this Complaint.

60.     Starting no later than May 2015 and continuing through the present, Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

61.     By reason of the foregoing, Defendants have violated, and unless enjoined, are reasonably likely to continue to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

## Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

62.     The Commission repeats and realleges paragraphs 1 through 48 of this Complaint.

63.     Starting no later than May 2015 and continuing through the present, Defendants, directly and indirectly, by use of any means or instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of

22

the securities, knowingly or recklessly employed devices, schemes or artifices

to defraud.

64.     By reason of the foregoing, Defendants violated and, unless

enjoined, are reasonably likely to continue to violate Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT VI

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

65.     The Commission repeats and realleges paragraphs 1 through 48 of

this Complaint.

66.     Starting no later than May 2015 and continuing through the

present, Defendants, directly and indirectly, by use of the means or

instrumentalities of interstate commerce, or of the mails, in connection with the

purchase or sale of any security, knowingly or recklessly made untrue

statements of material facts or omitted to state material facts necessary in order

to make the statements made, in the light of the circumstances under which they

were made, not misleading.

67.     By reason of the foregoing, Defendants have violated and, unless

enjoined, are reasonably likely to continue to violate Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT VII

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

68.     The Commission repeats and realleges paragraphs 1 through 48 of this Complaint.

69.     Starting no later than May 2015 and continuing through the present, Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

70.     By reason of the foregoing, Defendants have violated, and unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## VI.     RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find Defendants committed the violations of the federal securities laws alleged herein and:

## A.

### Temporary Restraining Order and Preliminary Injunctive Relief

Issue a Temporary Restraining Order and a Preliminary Injunction restraining and enjoining Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) and Rule 10b-5 of the Exchange Act.

## B.

### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney, any officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## C.

### Disgorgement

Issue an Order directing all Defendants and all Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### D.

### <u>Civil Penalty</u>

Issue an Order directing the Defendants Harbor City, HC Ventures, the HC SPEs, HC Digital, HCC Media, and Maroney to pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### E.

### <u>Sworn Accounting</u>

Issue an Order directing all Defendants and all Relief Defendants to provide a sworn accounting of all proceeds received resulting from the acts/or courses of conduct alleged in this Complaint.

### F.

### <u>Asset Freeze</u>

Issue an Order freezing the assets of all Defendants and all Relief Defendants until further Order of the Court.

### G.

### <u>Records Preservation</u>

Issue an Order restraining and enjoining all Defendants and all Relief Defendants from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the

books, records, documents, correspondence, brochures, manuals, papers,

ledgers, accounts, statements, obligations, files and other property of or

pertaining to all Defendants and all Relief Defendants, wherever located and in

whatever form, electronic or otherwise, that refer, reflect or relate to the acts or

courses of conduct alleged in this Complaint, until further Order of this Court.

## H.

### **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## I.

### **Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain

jurisdiction over this action and the Defendants and Relief Defendants in order

to implement and carry out the terms of all orders and decrees that it may enter,

or to entertain any suitable application or motion by the Commission for

additional relief within the jurisdiction of this Court.

### **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury in this case.

April 19, 2021                    Respectfully submitted,


By:  s/ Alise Johnson
     Alise Johnson
27

Senior Trial Counsel
Florida Bar No. 0003270
Direct Dial:  (305) 982-6385
E-mail:  johnsonali@sec.gov

Attorneys for Plaintiff
**U.S.    Securities    and    Exchange
Commission**
801 Brickell Avenue, Suite 1950
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154